1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E-FILED 12.28.11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNIHAN CORP.,                              )    CASE NO. CV 09-07921 MMM (PLAx)
                                           )
        Plaintiff and Counter-Defendant,   )
                                           )
              vs.                          )    FINDINGS OF FACT AND
                                           )    CONCLUSIONS LAW
MAX GROUP CORP.                            )
                                           )
        Defendant and Counter-Claimant.    )
                                           )
_____)

        Plaintiff Unihan Corp. ("Unihan") commenced this action on October 29, 2009, alleging

breach of contract and other common law claims.[1]  On January 5, 2010, defendant Max Group

Corp. ("Max") filed an answer that pled two counterclaims for breach of contract.[2]

        The case was tried to the court from May 31 to June 4, 2011.  Thereafter, the parties

submitted written trial briefs.[3]  Having considered the evidence presented, the arguments of

        [1]Complaint for (1) Breach of Contract and (2) For Work, Labor, and Materials
("Complaint"), Docket No. 1 (Oct. 29, 2009).

        [2]Answer and Counterclaim Against Unihan, Corp., Docket No. 10 (Jan. 5, 2010).  On
September 10, 2010, Max Group filed a first amended answer, which added the affirmative
defense of rescission. (Amended Answer and Counterclaim, Docket No. 38 (Sept. 10, 2010)).

        [3]Unihan Trial Brief, Docket No. 128 (June 21, 2011); Plaintiff's Post-Trial Proposed
Findings of Fact and Conclusions of Law ("Unihan FFCL"), Docket No. 129 (June 21, 2011);

counsel, and the parties' trial briefs, the court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I.    FINDINGS OF FACT

### A.    Background Regarding the Parties and the Transactions

1.  Unihan is a corporation organized under the laws of the Republic of China (Taiwan) with its principal place of business in Taipei, Republic of China (Taiwan).  Max is a California corporation with its principal place of business in City of Industry, California.[4]

2.  Unihan is a manufacturer of telecommunications- related products.[5]  Max is a wholesaler or distributor of computer and other electronic equipment.[6]  In 2007, Max formed a Max Media unit within Max and named David Tang its president.[7]

3.  Television transmission in the United States was scheduled to migrate from analog to digital by February 2009.  To encourage consumers to purchase digital-to-analog converter boxes so that they could use their analog televisions to watch digital transmissions, the United States Department of Commerce's National Telecommunications and Information Administration ("NTIA") offered a coupon program that provided consumers with a credit toward the purchase of a converter box.[8]  Tang became aware of the coupon program in

_____

Max Trial Brief, Docket No. 126 (June 21, 2011); Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law ("Max FFCL"), Docket No. 127 (June 21, 2011)

[4]Amended Final Pretrial Conference Order ("PCO"), Docket No. 92 (May 6, 2011) at 2-3.

[5]RT Day 1 (Huang) at 12:4-10.

[6]RT Day 1 (Tang) at 86:9-23.

[7]*Id*. at 86:1-8.

[8]*Id*. at 87:3-10 ("Q.  Now, at some time either late 2007 or early 2008, you became aware of a United States government coupon program regarding digital to analog converter boxes; correct?  A.  Correct.  Q.  And you understood that the television transmission signals in the United States were going to change from analog to digital; correct?  A.  Correct.  Q.  And therefore, people in the United States who had analog televisions would either need to buy a digital

2

late 2007 or early 2008.[9]  At the time, the deadline for using a NTIA coupon to purchase a converter box was February 17, 2009.[10]

**B.     Pre-Agreement Representations, Negotiations, and the Issuance of Purchase Orders**

4.     In early 2008, Bob Hoard, a representative of Auvitek, Inc. ("Auvitek") approached Tang. Auvitek was designing a chip set to be used in converter boxes.  Hoard introduced Tang to Mark Pai, an employee in Auvitek's Taiwan office, so that Tang and Pai could further discuss the concept.  The two had a few discussions via telephone.  Tang then flew to Taiwan in May 2008, where he met first with Pai of Auvitek and Daniel Kuo of Powerray Corp. ("Powerray").  Powerray was designing the main functionality in the converter box for which Auvitek was to provide the integrated circuit.[11]

5.     Pai and Kuo escorted Tang to Unihan's office.  Tang understood that Auvitek, through Pai,

---

television or a converter box to continue watching TV; correct?  A.  Correct.").

[9]*Id.* at 86:24-87:2.

[10]*Id.* at 100:11-20.

[11]*Id.* at 88:1-89:16 ("So you were approached by an Auvitek representative not about an entire box, but about one product that would go in that box; correct?  A.  Yes.  Q.  And in talking to that representative – by the way, you don't remember that person's name, do you?  A.  His first name is Bob. . . .  Q.  But you were interested in getting further information about this; correct?  A.  He came to me, and then he started saying that he can introduce me to a person or a group of persons that is doing the converter box.  Q.  And was that person he introduced you to Mark Pai?  A.  Correct.  Q.  Who also worked at Auvitek; correct?  A.  Correct, he works out in Taiwan.  Q.  And then you had discussions with Mark Pai following that meeting with Bob; correct?  A.  Bob introduced me to Mark Pai, and then he asked Mark to call me from Taiwan.  Mark Pai called me from Taiwan. . . .  Q.  And you had a few discussions with Mark Pai over the phone before meeting him; is that correct?  A.  Correct.  Q.  And after those discussions, you were further interested in this chip set for converter boxes; correct?  A.  He told me that he knows a design house that uses their chip in a converter box. . . .  Q.  And so you flew to Taiwan and met with Mark Pai; correct?  A.  I flew to Taiwan.  There were two reasons.  Mark Pai was going to hook me up with Power Ray and also Unihan as a manufacturer"); *id.* at 91:23-92:2 ("Q. . . . You understood that Power Ray was developing the main functionality in the box and that Auvitek was providing the IC; is that correct?  A.  Correct").

was setting him up with "Unihan as a manufacturer."[12]  At the time of the meeting in Unihan's office, Tang had not seen an actual design for a converter box.  Tang met with Dr. Steve Huang and Phoebe Chien of Unihan, among others.[13]  They discussed the potential project with Tang and estimated that the cost to manufacture converter boxes would be $5.00 per unit.[14]

6.   Following the meeting at Unihan's office, Tang went back to Auvitek's office with Pai and Kuo.  There, Tang saw a sample converter box for the first time.  Tang was not able to test the converter box at Auvitek's office because the channel frequencies in Taiwan are different than those in the United States.[15]

---

[12]*Id.* at 89:15-16.

[13]*Id.* at 92:3-20 ("Q.  You then went to Unihan and met with several Unihan people including Dr. Huang and Phoebe Chien; correct? A.  Correct.  Q.  And in those meetings, you discussed materials, the cost of the product; is that correct?  A.  Actually, that meeting was hosted by Phoebe Chien.  She was the host to – she did a, you know, corporate presentation first, introduce Unihan to me, or to Max, and Steve were there.  Dr. Huang was there.  There was about 20 or some-odd people there.  And so was Daniel, Power Ray.  THE COURT:  That's Daniel Kuo.  THE WITNESS: Yes, ma'am. Q.  BY MR. FIGUEIREDO:  Did you discuss the costs of the product at that meeting?  A.  Yes, we did.  Q.  And were you told that the price would be $35 per unit?  A.  My target price was 23, 28.  We were discussing the price").

[14]RT Day 1 (Huang) at 27:3-29:7 ("Q. And what was the expected manufacturing cost for manufacturing 100,000 of these converter boxes?  A. Based on the situation at Unihan in 2008, it would cost about 5 U.S. dollars per unit. Q. Are you familiar with the difference between fixed costs and variable manufacturing costs? A. I understand them very well. . . .  Q. And did the $5 per unit manufacturing cost on the Max Group project include both fixed and variable cost? A. Yes. . . . Q. And can you give us a breakdown as to the $5, what portion was fixed and what portion was variable?  A. It varies from product to product.  Not all products are the same.  But generally speaking, fixed cost usually is about 30 percent, and variable cost is usually 70 percent.  Q. And I'm asking specifically on this product for Max Group, the converter boxes. A. In that case it has to be calculated in detail, but generally speaking, those two numbers can be applied to it.  Q. 30 percent and 70 percent? A. Yes.").

[15]RT Day 1 (Tang) at 93:7-25 ("Q.  So after the meeting, you went back to Auvitek's office with Mark Pai and Daniel Kuo; is that correct?   A.   Mark took me to their Taiwan office, Auvitek's Taiwan office.  Q.  Along with Daniel Kuo?  A.  Yes.  Q.  And it was there for the first time that you saw a sample converter box; correct?  A.  Correct.  Q.  Now, you wanted to test that product then and there, didn't you?  A.  Yes, I did.  Q.  But you were not able to, were you?

7.      After Tang returned to the United States, Powerray sent Tang a sample converter box. Tang tested the sample and, on June 14, 2008, reported problems to Kuo concerning, among other things,[16] that the "picture doesn't seem to be as vivid . . . especially on the red color."[17]

8.      Pai and Kuo then sent Tang a modified sample, which Tang tested again. He noticed that "half the problems went away" because "50 percent of the problem[s] with the first batch . . . were AC adapter related," and Powerray had "replaced the different AC adapters."[18] Although the "the other half of the problems were still there," it is unclear whether Tang reported them to Pai or Kuo.[19]  Tang never received a third sample from Powerray or

_____

A. No.  Q.  And that's because the television transmission signals in Taiwan are different than the signals in the United States.  So you had to be in the United States to test; is that correct? A. Correct.  The channel frequencies are different, yes").

[16]*Id.* at 94:1-95:7 ("Q.  So after you returned to the United States, Mark Pai or Daniel Kuo then delivered the sample box to you, did they not?  A.  They delivered two samples but without the box, without the enclosure. . . . A.  And you tested those boards along with Johnny Tsai; correct?  A.  I tested myself.  I told Johnny that I'm going to test those boards.  Johnny went to buy some other product, but he didn't test it with me, no. . . . Q.  And when you tested it, you discovered some problems with the product that Mark Pai and Daniel Kuo sent you?  A.  Correct. Q.  And the problems were they were not getting enough channels; correct?  That was one of the problems?  A.  Yes.  Q.  It had poor picture quality? A.  Yes.  Q.  The screen would turn pink? A.  Correct.  Q.  The unit would power on and off intermittently?  A.  Correct.  Q.  So after you tested the product that Mark and Daniel sent you, you notified Mark, Daniel, and Oscar Cheng of the problems, did you not?  A.  Yes").

[17]Exh. 165 at M0121.

[18]RT Day 1 (Tang) at 96:8-23.

[19]At trial, Tang testified that he did report these problems to Pai and Kuo.  (*Id.* at 96:24-97:6 ("Q.  But the other half of the problems were still there?  A.  Correct.  Q.  And you didn't report those problems back to anyone, did you?  A.  I let Johnny know.  Q.  But you didn't get back to Mark Pai or Daniel Kuo about those problems, did you? A.  I did.").)  In his previous deposition testimony, Tang had been more equivocal, noting that there were lots of emails going back, but Pai and Kuo were sick in the hospital and didn't have access to a computer.  (Id. at 97:7-98:3 ("MR. FIGUEIREDO:  Your Honor, I'd like to read a portion of Mr. Tang's transcript. . . . MR. FIGUEIREDO: (Reading.) 'QUESTION: Did you report the results of that second test back to anybody?  Did you communicate them to anybody?' 'ANSWER: I don't recall

1    Auvitek.[20]

2    9.    In June and July 2008, Tang discussed with Unihan's Oscar Cheng the possibility that Max

3          would purchase 500,000 converter boxes from Unihan, which would be known as the

4          "Lutro" converter boxes.[21]   No purchase orders, however, were placed.[22]   Huang

5          instructed everyone at Unihan to take no action to manufacture boxes until a purchase order

6          was received from Max.[23]

7    10.   In July 2008, Tang traveled to China to inspect Unihan's manufacturing facility.   During

8          his visit, Tan became concerned because he did not see Unihan engaged in any part of the

9          manufacturing process for the Lutro converter boxes.   Tang was expecting "some kind of

10         engineering team there to [be] engage[d] in the Max converter box," but "there was no

11         activity."   Tang was particularly concerned because of the "time pressure" and "limited

12         window of opportunity" to capitalize on the government's coupon program, which "was

13         set to expire" in February 2009.[24]

14   _____

15   the detail because there were lots of e-mails going back.  I don't recall exactly. Mostly through
     phone conversation and because they were sick in the hospital for so long.  So 10 days later we
16   start to -- communication, you know, through the phone.  Especially when they were still in the
     hospital.  At the end of the time, they were able to speak but not access of computer.'").)
17

18   [20]*Id.* at 98:4-10.

19   [21]Max FFCL at 6 (citing Exhs. 1, 2, 3, and 45).

20   [22]RT Day 1 (Tang) at 98:20-99:3.

21   [23]RT Day 1 (Huang) at 24:17-23.

22   [24]RT Day 1 (Tang) at 99:4-101:1 "Q.  Now, in July you arranged to go and inspect
23   Unihan's manufacturing facility in China; correct? A.  Correct. Q.  And you went to China and
     visited Unihan's manufacturing facility; correct?  A.  Correct.  Q.  And at Unihan's manufacturing
24   plant, you personally saw Unihan manufacturing set top boxes for Samsung and Sony; correct?
     A.  Yes.  Q.  And just for definitional purposes, is it fair to say that a converter box is one type
25   of set top box?  A.  No, it's different.  Q.  How would you categorize a converter box?  A.  Let
     me categorize set top box.  It's just like our DirecTV box.  It's cable box.  Converter box is free
26   air broadcasting box.  It's very different.  One is cable.  One is free air.  Q.  Okay.  You did not
     see Unihan manufacturing any converter boxes for Max Media when you were in China in July;
27   correct?  A.  Correct.  Q.  And that concerned you, didn't it?  A.  Yes.  Q.  You were expecting
28

11. After Tang's visit to China, he contacted Pai and expressed concern about the lack of manufacturing activity and the time pressure created by the coupon program. As a result, Pai flew to Los Angeles in late July 2008 for a series of meetings at Max's offices.[25] During these meetings, Pai represented that although he was employed by Auvitek, he would be joining Unihan immediately, where he would continue to work on Max's Lutro converter box project.[26] He also represented that Huang, a general manager at Unihan, had asked him to negotiate the terms and conditions of Lutro converter box purchase orders, and knew that he was doing so.[27] Unbeknownst to Max, Pai did not have authority to act,

---

there to be converter boxes being manufactured for Max Group; correct? A. No. I expected some kind of engineering team there to engage in the Max converter box. Q. And there was no activity; correct? A. Correct. Q. And you were concerned because of the time pressure; correct? A. Yes. Q. And the coupon program had a limited window of opportunity; correct? A. Correct. Q. And it was set to expire -- when was it set to expire? A. First was set to expire February of 2009. . . . Q. So at the time, July 2008, your understanding was it was going to expire when? A. February 2009. Q. So you were concerned that by the time things got started with Unihan and you received the product, it would be too close to the end of the period; correct? A. I was concerned that most of the engineering is still done in Taiwan. China has not even started on the process of the Max converter box.").

[25]*Id.* at 101:2-21.

[26]RT Day 2 (Tang) at 35:25-37:3 ("Q. Turning back to the discussions and negotiations with Mark Pai in Los Angeles. At the time that he came to meet with you, had you had any discussions with him as to whether he was going to join Unihan? A. Yes. Q. And had you had those discussions as early as May of 2008? A. Yes. Q. And what was he telling you? A. He told me on May 28th, after the Unihan meeting, that he was going to join Unihan very quickly. And again, when he took me to their Taiwan office, he said the whole group, the whole Auvitek group Taiwan will join Unihan very quickly. Q. And who was the Auvitek group that he was talking about? A. Oscar, who was a sales manager for Auvitek Taiwan, Eunice, and the other names I don't remember. Q. Athena and Alger? A. Possibly, yes. Q. And in July, when he's at Max's office, did you have any discussions as to who he was negotiating on behalf? A. He said he's negotiating on behalf of Steve Huang of Unihan. Q. And what else did he tell you about that? A. He said he will work very hard to try to get orders so he will earn an executive position within Unihan. Q. Did he tell you that he was acting with Dr. Huang's knowledge and consent at that time? A. Yes, he told me he has full authority of pricing, payment term, and – he has full authority").

[27]*Id.*

7

negotiate, or make any representations on Unihan's behalf.  Pai did not join Unihan as an employee during the course of the project.[28]

12.   While Pai was in Los Angeles, Tang continued to speak with Cheng in Unihan's Taiwan office.[29]  Follwing these discussions, on July 21, 2008, Max issued Purchase Order ("PO") No. 142034 for 400 "Maxmedia Lutro NTIA approved converter box kit[s] defined and spec by Powerray" at a $35 unit price, for a total of $14,000, and a credit or finance term of net 30 days.[30]  Delivery was specified as "in 3 weeks (partial if necessary)."[31]

13.   Following receipt of PO No. 142034, Cheng sent Tang an email stating: "I got the PO. One question is our payment is T/T in advance not net[ ] 30 days."  The email included Unihan's "internet schedule" for other anticipated Lutro converter box purchase orders. The proposed schedule was as follows: (1) sample order: 100 pieces – August 10, 2008 delivery to customers from Taiwan; (2) engineering run order: 50 pieces – August 25, 2008 delivery to customers from Shanghai; (3) pilot run order: 250 pieces – September 4, 2008 delivery to customers from Shanghai; (4) mass production forecast production order: 200,000 pieces – September 30, 2008 delivery to customers from Shanghai; and (5) rolling forecast from October: 500k per month.[32]

14.   At approximately this time, Tang became more convinced that Pai's analysis of the marketability of the converter boxes was correct.  He contacted a Walmart representative to discuss Walmart's interest in the converter boxes, who expressed interest in the

---

[28]Max FFCL, ¶ 32 (citing RT Day 1 (Huang) at 19:20-20:2; 56:9-57:1).

[29]RT Day 1 (Tang) at 101:21-24 ("Q.  And during that same period of time, while you were meeting with Mark Pai daily, you were also talking to Oscar Cheng, who was back in Unihan's Taiwan office; correct?  A.  Correct").

[30]PCO at 3 ("Admitted Fact 1: Max issued all of the following purchase orders to Unihan, none of which are claimed to be forgeries: (a) Purchase Order No. 142034 for 400 units of Lutro converter boxes was issued on July 21, 2008")); Exh. 1.

[31]Exh. 1.

[32]Exh. 4.

converter boxes.  He also relied on Pai's report of a similar discussion he had had with a Best Buy representative.[33]

15.   On July 23, 2008, Max Group issued PO No. 142108 for the purchase of 100,000 converter boxes at $33.50 per unit.  The purchase order stated that the units were to be delivered by September 30, 2008.  It also specified that the "Lutro box should be built to be 100% NTIA compliant as an NTIA approved converter box with analog pass through feature," and that "[p]arts and components must not be altered without the consent of Maxmedia."  The purchase order provided that the converter box was to "include all the necessary accessories," including a user manual.  Finally, it stated that Unihan was to "provide a 15 month + warranty to the Lutro box, [and a] return and repair procedure to be provided by" Unihan.  PO No. 142108 did not condition purchase of the 100,000 units on fulfillment of or language in any other purchase order, did not reference any other purchase order, and did not include a cancellation provision.[34]  Unihan accepted the terms

---

[33]RT Day 1 (Tang) at 103:10-104:19 ("Q. Now, before this purchase order was issued, you and Mark Pai talked about the market for these converter boxes; is that correct?  A.  Yes.  Q.  And Mark Pai, while he was in L.A. visiting you, said Best Buy will buy from us, Wal-Mart will buy from us, Radio Shack will buy from us.  Isn't that true?  A.  Yes.  Q.  And you then contacted – you personally contacted a representative of Wal-Mart to discuss their interest in these converter boxes; correct?  A.  Correct.  Q.  And you got the contact information for the Wal-Mart representative from Mark Pai; correct?  A.  I got the phone number for Wal-Mart's senior V.P. in charge of consumer electronics.  Q.  Was that provided to you by Mark Pai?  A.  Yes.  Q.  And then Mark Pai told that you he had just contacted a Best Buy representative to talk about their interest in these converter boxes; correct?  A.  Correct.  Q.  So after your discussion with the Wal-Mart representative and what Mark Pai told you about his discussion with the Best Buy representative, you felt pretty confident that customers would buy these products; is that correct?  A.  I feel there's a market need for it.  Not necessarily confident.  Q.  But you felt you had done enough due diligence on the market need?  A.  Somewhat, yes.  Q.  And as you did that, you became more and more convinced of Mark Pai's analysis of the marketability of these products; correct?  A.  Yes").

[34]Exh. 3.

1  of PO No. 142108.[35]

2

_____

3  [35]PCO at 3 ("Admitted Fact 1: Max issued all of the following purchase orders to Unihan, none of which are claimed to be forgeries:. . . (b) Purchase Order No. 142108 for 100,000 units of Lutro converter boxes was issued on July 23, 2008"); *id.* at 4 ("Admitted Fact 2: Unihan accepted the terms of Purchase Order No. 142108"). Max has requested that the court allow it to withdraw admissions in its original and amended answers to the complaint, as well as in the amended pretrial conference order, that, among other things, Unihan "'accepted' the terms of the Mass Purchase Order (Purchase Order No. 142108 for 100,000 units issued on July 23, 2008)." (Max Trial Brief at 2.) Under Rule 16(e) of the Federal Rules of Civil Procedure, "[t]he court may modify the order issued after a final pretrial conference only to prevent manifest injustice." "In evaluating a motion to amend a pretrial order a district court should consider four factors: (1) the degree of prejudice or surprise to the [other party] if the order is modified; (2) the ability of [that party] to cure the prejudice; (3) any impact of modification on the orderly and efficient conduct of the trial; and (4) any willfulness or bad faith by the party seeking modification." *Galdamez v. Potter*, 415 F.3d 1015, 1020 (9th Cir. 2005) (citing *Byrd v. Guess*, 137 F.3d 1126, 1132 (9th Cir. 1998)).

Max contends that allowing it to withdraw its admissions is appropriate because there is "a total contradiction and disparity between the evidence produced at trial and the Admissions." (Max Trial Brief at 7.) It cites trial testimony suggesting that Unihan never sent an acknowledgment confirming its acceptance of each of the terms of the mass purchase order and that the parties continued to negotiate particular terms as late as September or October 2008. Given this evidence, Max contends that "the Admissions were based on incorrect information that its former counsel placed in its Pleadings."

The court cannot allow Max to withdraw its admissions under the "stringent standard" of Rule 16(e). *In re O'Brien*, No. 10–00161–TLM, 2011 WL 1457304, *5 (Bankr. D. Idaho Apr. 15, 2011). Max first admitted that Unihan accepted the terms of PO No. 142108 in its January 5, 2010 answer to the complaint. (See Answer, Docket No. 10 (Jan. 5, 2010), ¶ 7 ("Admitted").) It reaffirmed this admission in its amended answer filed September 10, 2010. (Amended Answer, Docket No. 38 (Sept. 10, 2010), ¶ 7 ("Admitted").) On September 23, 2010, Max substituted attorney Eliot L. Teitelbaum in place of its prior counsel. At all times thereafter, Teitelbaum represented Max in the action. On April 21, 2011, Max, through Teitelbaum, once again reaffirmed its admission by including it in the "Admitted Facts" section of the joint final pretrial conference order. After a first pretrial conference, the parties amended the final pretrial conference order; the amended version also included the now-disputed admission. As is apparent, throughout the course of this litigation, Max has repeatedly admitted that PO No. 142108 was a binding agreement to which both parties had assented. As a result, Unihan would be severely prejudiced if the court released Max from its binding admission after the conclusion of the trial.

Max repeatedly notes that "Unihan made no attempt proactively to contest Max's evidence that no meeting of the minds ever existed and that Unihan never accepted the terms of the Mass Purchase Order." (Max Trial Brief at 3.) Unihan made no attempt to adduce evidence that it had accepted the terms of PO No. 142108 because, given Max's repeated admissions, it believed the fact had been conclusively established for purposes of trial. Additionally, given that the fact was

### C.   Unihan Begins Manufacturing Process

16.   Unihan immediately began purchasing component parts in sufficient quantities to manufacture 100,000 converter boxes by September 30, 2008, and rushed its suppliers to deliver components on an expedited schedule.[36]

17.   On July 29, 2008, Max issued and delivered PO Nos. 142034A and 142214 to Unihan, for 100 and 300 converter boxes respectively; these purchase orders were intended to replace PO No. 142034.  The unit price for both POs was $35 and both contained similar language to PO No. 142108 regarding "100% NTIA complian[ce,]" alteration of parts and materials, and inclusion of "all the necessary accessories."  Although the language, "Maxmedia Lutro NTIA approved converter box kit defined and spec by Powerray" was not included in these POs, it was Max's understanding that specifications for the converter

---

admitted as early as January 5, 2010, before discovery commenced, Unihan undoubtedly conducted discovery in reliance on Max's representation that this fact was not in dispute.  At this late stage of the proceedings, after discovery and motion practice is complete and trial has concluded, Unihan cannot "cure" the prejudice associated with Max's belated attempt to withdraw its admission.  Had Max raised this issue earlier, e.g., in September 2010 when Teitelbaum substituted in as counsel, or in May 2011 at the final pretrial conference, Unihan might have been able to alter its trial strategy or request additional discovery, and avoid prejudice from Max's change of heart.  It did not, the court therefore denies Max's request to allow it to withdraw the admission.

[36]RT Day 1 (Huang) at 29:8-21 ("Q. Dr. Huang, are you aware as to whether or not Unihan ordered materials to manufacture the hundred thousand converter boxes? A. Yes. Q. And when did that happen? A. When our sales personnel showed me the purchase order, I looked at it, and at that time it was understood that things were quite urgent.  So that same day, our P.M. inputted the information into the computer. THE REPORTER: P.M.? THE COURT: Product manager.  THE WITNESS: Generally speaking, our material controller would place the order to our supplier, for the electronic material within one week."); id. at 35:19-36:5 ("Q. BY MR. FIGUEIREDO:  Now, Dr. Huang, by the time that Max Group stopped the production, do you have an understanding as to whether Unihan had already received parts in order to manufacture the 100,000 converter boxes? A. At what time you mean? Q. At the end of August 2008. A. Are you talking about whether or not at that time we had received the materials? Q. Yes. A. Correct.  According to the purchase order, and we rushing the supplier for materials, and the first production could be started in August.").

1   boxes had to be provided by Powerray.[37]

2   18.   On August 12, 2008, Unihan manufactured one hundred converter boxes.  Max's Frank

3   Chang and Sue Tsai picked up ten of these in Taipei before August 15, 2008.  Unihan

4   shipped the remaining ninety to Max's Los Angeles office; they arrived on approximately

5   August 20, 2008.[38]

6   19.   On August 19, 2008, Cheng informed Tang that Unihan was scheduled to complete the

7   first 25,000 converter boxes from the mass production order by September 4, 2008.

8   Cheng stated that he "need[ed] the user manual for [the] Spanish version before 22/Aug.

9   Otherwise, [mass production] will miss the Spanish version in user manual."[39]

10   20.   On August 21, 2008, Tang informed Unihan that one of the one hundred converter boxes

11   "displayed bright orange color on the OSD and the picture color is all wrong, so we think

12   this box is bad."  Thirty minutes later, Tang informed Unihan that "[a]fter [he] turned off

13   the power and restart[ed] the box, it seemed OK again."[40]

14   _____

15   [37]Exhs. 2 and 45; RT Day 1 (Tang) at 110:22-111:22 ("Q. Now, if you look back in

16   Exhibit 1 again, right under product description, do you see where it says Max Media, Lutro

17   NTIA approved converter box kit defined and spec by Power Ray?  A. Yes, I do. . . .  Q. Did you understand that was because Power Ray had designed the converter box?  A. Yes. . . .[Q.]

18   Under product description on Exhibit 1.  Max Media, Lutro NTIA approved converter box kit defined and spec by Power Ray.  Q.  Now, Mr. Tang, that same language is not on Exhibits 2,

19   3, or 45.  Can you please confirm that?  A. Yes.  Q. But was it still your understanding that the converter boxes had to be – were the same ones to be defined and specked by Power Ray? A. Yes.

20   Q. So after these four purchase orders were issued, there were really only three that were

21   pending; correct?  Because Exhibit 1 was superseded by Exhibits 2 and 45; correct?  A. Correct").

22   [38]RT Day 1 (Tang) at 115:24-117:11; Exhs. 6 and 150.  See also RT Day 2 (Tang) at

23   114:5-9 ("Q. My question is the hundred units were to be delivered by August 15th; correct?  A.

24   Correct.  Q. So that shipment was not late; correct?  A. Correct.").

25   [39]Exh. 6.

26   [40]Exhs. 7 and 228; RT Day 2 (Tang) at 109:9-110:3 ("Q. This is an e-mail you sent on

27   August 21st, 2008, at 4:08 P.M.; correct?  A. Correct.  Q. Where you're saying there was one box displaying with bright orange color on the OSD and the picture color is all wrong.  So we

28   think the box is bad.  Do you see that?  A. Yes.  Q. That's Exhibit 7.  And then Exhibit 228 is

21.   On August 26, 2008, Tang informed Unihan that another one of the one hundred converter boxes had color problems.  He stated: "[T]his [is] the 2nd box that we see have a problem out of 20 boxes we tested."[41]  That same day, Cheng responded: "The attached file is updated firmware to solve the OSC become red color problem.  I [spoke] with Powerray, and, they say you have the tools before.  So, I just attached the updated firmware and the firmware update manual to you.  This bug will be gone after update the firmware.  Please try it!"[42]  On August 27, 2008, Unihan arranged with Pai to send an Auvitek engineer, Jiang Zhi, to identify the defects with the 100 samples.[43]

22.   On August 27, 2008, Cheng proposed a delivery schedule for the mass production order.  The schedule contemplated delivery of 25,000 converter boxes on each of September 19, September 25, October 2, and October 9, 2008.  Cheng asked  Tang to "arrange your delivery schedule to us before 29/Aug."[44]  In response, on August 27, 2008, Tang instructed Unihan to "[p]lease wait for our further notice of the MP [because] there are still technical problems with the box, the pr[i]cing iss[u]e, and customer problem[s]."[45]  Notwithstanding Cheng's proposed delivery schedule, Unihan had the capacity, on August

---

sent the same day at 4:47 P.M.  So 39 minutes later, to the same recipients, Oscar and Vicky, and it says: 'Dear Oscar, after I turned off the power and restart the box, it seemed okay again.  Will keep you informed.'  Isn't this the same box that these two e-mails are talking about 39 minutes apart?  A. Yes").

[41]Exh. 8.

[42]*Id.*

[43]RT Day 1 (Tang) at 140:5-141:7; RT Day 2 (Tang) at 81:16-83:8; Exh. 123 (August 29, 2008 email from Hoard informing Tang that Zhu would be visiting Los Angeles).

[44]Exh. 11.

[45]*Id.*; PCO at 4 ("Admitted Fact 3: On August 27, 2008, Max's then employee, David Tang, sent an email to various representatives of Unihan stating: 'Please wait for our further notice of the MP [Mass Production], there are still technical problems with the box, the pr[i]cing iss[u]e, and customer problem[s]'").

13

27, 2008, to manufacture all 100,000 converter boxes by September 30, 2008.[46]

**D.     Max's Stop Work Order and Subsequent Negotiations**

23.     On September 3, 2008, Tang reiterated his instruction that Unihan not move forward with mass production, stating: "The converter box program has short life as we all know, that is why I put a hold and stop on the production as you all should refer to the conditions that we listed on the PO."[47]

24.     At the time Max stopped production, it had a purchase order from Microcenter for 2,000 converter boxes.[48]  Max had been in discussions with Winn-Dixie about purchasing 20,000

---

[46]RT Day 1 (Huang) at 33:20-34:19 ("Q. Dr. Huang, do you have an understanding as to whether Unihan could have completed the production before September 30, 2008, of the 100,000 converter boxes had Max Group not asked to stop production?  A. According to our manufacturing plan, in August, yes.  Q. What was the manufacturing plan in August?  A. According to the related situation, like the materials supply situation and our manufacturing capacity at the time, my expectation that we will be able to start shipping in September.  I think in three or four weeks we will be able to complete the delivery.  Q. And would those be three or four weeks starting in the beginning of September, middle of September, or end of September?  A. At the time I think we were planning to start the production at the end of August.  I think the first shipment of 20 to 30 K units will be – would be shipped out about around the beginning of September.  Q. Dr. Huang, had Max Group not put a stop, could Unihan have complied with all the terms of the purchase order, which is Exhibit 3?. . .  THE WITNESS:  Yes").

[47]PCO at 4 ("Admitted Fact 4; On September 3 or 4 (depending on whether measured by U.S. time or Taiwan time), 2008, Max's then employee, David Tang sent an email to various representatives of Unihan stating, among other things: 'The converter box program has short life as we all know, that is why I put a hold and stop on the production as you should all refer to the conditions that we listed on the PO'"); Exh. 12; RT Day 1 (Huang) at 32:17-33:19 ("Q. Unihan never completed production of the 100,000 boxes; is that correct?  A. In the end not a single unit was manufactured.  Q. Not a single unit against the 100,000; correct?  A. Correct.  Q. Why not?  A. Because at the time when we were arranging the manufacturing procedure, David Tang notified my salesperson, and my salesperson relayed that information to me that David Tang asked to stop the manufacturing for a while.  Q. Did you have an understanding of why Unihan was asked to stop the manufacturing for a while?  A. According to my salesperson, Oscar, it seems that at the time Max Group have some issues with his client in regard to the delivery date, pricing, and other issues. . . .  Q. Dr. Huang, were you aware of any instruction from Max Group to commence with the production of the hundred thousand units after the stop?  A. No").

[48]RT Day 1 (Tang) at 119:16-120:2 ("Q. Okay.   Another potential customer was Microcenter; correct? A. Correct. . . .  Q. And Microcenter had placed – your understanding is

converter boxes, but no purchase order had ever been placed.  Tang considered Winn-Dixie "at best a potential customer."[49]  Max's third potential customer was David Memsen.  But Memsen had previously received a severe warning from NTIA because it had advertised Max's Lutro boxes on its website on August 1, 2008, before the product had been NTIA approved.[50]

25.   Max was also concerned that "the market price [of the converter boxes] was going down. . . . [The] price was sliding at a pretty rapid rate.  So [the] price [Max had] negotiated [with Unihan] way back in May [was being] affect[ed by] the market price in August."[51]  Max also discovered that "re[]tailers [were] very passive in promti[ng] the box, [because] they [would] rather sell more TV[s]. . . ."  It concluded that the "project [was] way late."  Although it "work[ed] very hard to squeeze into the tail end of th[e] [coupon] program," it found that the task was "[n]ot easy!!!!"[52]

26.   Following Max's stop work order in early September 2008, the parties engaged in a series of negotiations to lower the per unit price specified in PO No. 142108.[53]  They were unable

---

that they had placed a purchase order to Max Group by the middle of August 2008; is that correct? A. Yes.  Q. And the purchase order was for 2,000 units; correct?  A. Correct").

[49]*Id.* at 118:19-119:15.

[50]*Id.* at 121:25-122:14.

[51]*Id.* at 126:13-17.

[52]Exh. 123.

[53]RT Day 1 (Huang) at 36:16-37:21 ("Q. After waiting a few weeks for the manufacturing to be resumed, was the manufacturing ever resumed?  A. No.  At that time Oscar kept asking the other side, but they did not give any responses.  So by the time when it got to September, I got really nervous.  Q. So what happened next?  A. It seems that at the time David Tang said that market price had dropped, and he was asking us to lower the price and then sell the products to them.  Q. What was your reaction to that?  A. At the time I was quite angry because it was – the price and everything was specified in the purchase order, and how could you just change the price.  But according to my business experiences, I decided to ask Oscar to inquire the other party, and if the price was only about 1 or $2 less, we could still lower the price and sell the product.  Therefore, the company would not incur that much loss.  Q. Did that happen?  A. In the end the

15

to come to agreement regarding revised terms, however.[54]  On September 25, 2008, Max reissued and delivered to Unihan, PO No. 142214 for 300 converter boxes at a reduced rate of $30 per unit.[55]

27.    On September 27, 2008, Max employee Vicky Tsai emailed Unihan, stating, "[W]e have two converter boxes [that] ]need[ ] . . . RMA. Will you give us two extra converter boxes to replace those two RMA boxes or will you deduct from the payment? On this shipment, if there [are] more converter boxes [that] need . . . RMA, we will ship those two RMA converter boxes back together  . . .  with others to you."[56]  Those were the only two converter boxes for which Max ever sought a refund or replacement.[57]

28.    In early October 2008, Unihan manufactured 302 converter boxes representing the 300

---

price kept getting lower and lower; however, David Tang never initiated any commencements for the delivery.  My guess was that maybe at the time David Tang did not have that much of a request in the amount that he was talking about, or maybe by that time he did not have any client anymore.  Q. At some point did it become clear to you that Max Group was not going to ask Unihan to commence the production?  A. Correct. It became quite clear later on because we couldn't even find David Tang when we tried to look for him.  Q. When was that? A. I think it was around October. What I meant was that it was very, very difficult to contact him").

[54]*Id.*

[55]PCO at 3 ("Admitted Fact 1: Max issued all of the following purchase orders to Unihan, none of which are claimed to be forgeries: . . . Purchase Order No. 142214 for a total of 300 units of Lutro converter boxes (listed as 50 units and 250 units) at a price of $30 per unit. . . .  This Purchase Order was dated July 29, 2008, but was issued on September 25, 2008"); Exh. 5.

[56]Exh. 150; RT Day 2 (Tang) at 111:3-112:1 ("Q. Mr. Tang, I'm going to ask you to look at Exhibit 150. . . .  A. Okay.  Q. And this is an e-mail from Vicky Tsai to Eunice Cho at Unihan on September 27, 2008, and you're copied on it; correct? A. Right.  Q. And consistent with your prior testimony, Vicky Tsai was your assistant.  She sent these e-mails either dictated by you or at your request; correct?  A. Correct.  Q. And this was also one she sent that you asked her to send; correct? A. Correct.  Q. And this e-mail says on the second line – on the end of the first line, it says: 'On the last shipment, we have two converter boxes needed to do RMA.  Will you give us two extra converter boxes to replace those two RMA boxes, or you will deduct from the payment?' Do you see that?  A. Yes, I do.  Q. And those are the only two boxes for which Max Group ever asked for a refund or replacement; correct?  A. Correct").

[57]RT Day 2 (Tang) at 111:24-112:1.

converter boxes specified in PO No. 142214 and the two replacement converter boxes that Tsai had requested on September 27, 2008.  Max never accepted delivery of any of these boxes.[58]

29.  As a result of Max's stop work order, and the failure of subsequent price negotiations, Unihan did not complete the manufacture of the 100,000 Lutro converter boxes specified in PO No. 142108, and was not paid by Max for the mass production order.[59]

30.  By the end of September 2008, the Lutro converter box was placed on NTIA's approved list.[60]

**E.  Unihan's Damages and Mitigation Efforts**

31.  Unihan attempted to identify other buyers for the converter boxes, and for the unused component parts, but was unsuccessful.[61]

---

[58]*Id.* at 112:2-25 ("Q. Now I'd like to turn your attention to Exhibit 277 . . . .  Now, this is an e-mail at the bottom from Oscar at Unihan to you dated October 11, 2008.  Do you see that?  A. Yes.  Q. And it says: 'Dear David, sample 302 pieces was ready and I waiting you to TT to us now.  Please process it ASAP.'  Do you see that?  A. Yes.  Q. Isn't it true that it was 302 pieces because Unihan was going to ship two replacement pieces as requested by Max Group?  A. It appears to be. . . .  Q. But you never paid for that shipment; correct?  A. We paid for two of those.  Q. You didn't pay for the other 300; right?  A. Right.  Q. And you never approved the delivery of those units to Max Group; correct?  A. Correct"); Exh. 277.

[59]PCO at 4-5 ("Admitted Fact 5: Unihan did not complete the manufacture of 100,000 units of Lutro converter boxes specified on Purchase Order No. 142108.  [¶]  Admitted Fact 6: 100,000 Lutro converter boxes were never shipped to Max.  [¶]  Admitted Fact 7: Max never paid Unihan any amount in relation to Purchase Order No. 142108").

[60]RT Day 1 (Tang) at 123:10-13 ("Q. And the Max Media Lutro converter box, that made its way onto the NTIA approved list by the end of September 2008; correct?  A. Correct").

[61]RT Day 1 (Huang) at 37:22-39:8 ("Q. . . . Did Unihan – did you look into alternative solutions to sell the parts that Unihan had purchased but could not manufacture for Max Group?  A. Correct.  At the time we were quite nervous.  So at the time we were also seeking other clients.  So I asked Oscar to ask other clients whether or not they were in need of any type – any of these types of products.  Q. And what was the result of that?  A. We did not receive any order.  Q. Did you have any further discussions with David Tang about finding other customers for the product?  A. Correct.  At the time it was difficult to get in contact with him, but occasionally he would respond in e-mails, and he said at the time he was looking for other clients.  Q. Did you

32.  Unihan's manufacturing cost for the Lutro converter box was $5.00 per unit.  Variable costs comprised 70% of this amount, while fixed costs were 30%.  As Unihan did not ultimately manufacture the mass production order for Max, it did not incur variable manufacturing costs of $350,000.[62]

33.  Had Unihan purchased all of the components necessary to manufacture 100,000 converter boxes, the total cost to Unihan would have been $2,357,354.[63]  As a result of Max's stop

---

meet with David Tang in Shanghai at some point to discuss alternative solutions?  A. Correct.  Oscar had informed me that David Tang had a client in Shanghai.  So I was very cautious and act very formally.  So myself and Oscar visit that client in Shanghai.  Q. Was David Tang also there?  A. Yes, he accompanied us.  Q. Who else accompanied you?  A. And Mark Pai.  Q. And when was this?  A. It was around the end of October or the beginning of November in 2008.  Q. Who did he meet with?  A. When I went to that company, I forgot the name of that company.  There were a few people there.  One of the persons said that he was the person in charge in the Shanghai office for Best Buy.  Q. And were you able to make any arrangement with that potential customer to use any of these parts from the Max Group project?  A. At that time that person told me that, well, this product is very difficult to sell now, but he said that he would give it a try, but later he did not have any contact with me").

[62]RT Day 1 (Huang) at 27:3-29:7 ("Q. And what was the expected manufacturing cost for manufacturing 100,000 of these converter boxes?  A. Based on the situation at Unihan in 2008, it would cost about 5 U.S. dollars per unit.  Q. Are you familiar with the difference between fixed costs and variable manufacturing costs?  A. I understand them very well. . . .  Q. And did the $5 per unit manufacturing cost on the Max Group project include both fixed and variable cost?  A. Yes.  Q. And can you explain to us what the difference is between fixed cost and variable manufacturing cost?  A. Fixed manufacturing cost means the things like equipment and the venue.  In other words, things that will remain in existence after the manufacturing.  Variable manufacturing cost means the things, things like operators, salaries, and consumer type of things.  For example, gloves that are used by operators. . . .  Q. And can you give us a breakdown as to the $5, what portion was fixed and what portion was variable?  A. It varies from product to product.  Not all products are the same.  But generally speaking, fixed cost usually is about 30 percent, and variable cost is usually 70 percent.  Q. And I'm asking specifically on this product for Max Group, the converter boxes.  A. In that case it has to be calculated in detail, but generally speaking, those two numbers can be applied to it.  Q. 30 percent and 70 percent?  A. Yes").

[63]RT Day 4 (Li) at 64:8-65:11 ("Q. Now, Ms. Li, assuming that for each distinct part on Exhibit 75, Unihan purchased exactly enough quantities to manufacture 100,000 boxes at the unit prices set forth in Exhibit 75.  Were you able to do such a calculation?  A. Yes.  Q. What was that calculation? . . . THE WITNESS:  Do you want me to give – directly give you the number?  Q. BY MR. FIGUEIREDO:  Yes.  A. The U.S. – the number is U.S. dollars, 2,357,354.  Q. Okay.

1    work order, Unihan did not incur this full amount.  Rather, the sum Unihan expended

2    purchasing components parts for the mass production was $1,656,251.[64]

3    34.    On May 20, 2009, Unihan informed Max of its intent to discard components and offered

4          Max the opportunity to purchase the materials.  Max did not respond.[65]  In March 2010,

5          Unihan discarded the materials that it could not reuse or return.  The cost of the materials

6          discarded by Unihan was $1,428,190.[66]  Unihan received $19,532 in salvage value when

---

And can you explain exactly what you did to get that number?  A. I just used the materials that's in page 75 times unit price times quantity you needed for the production times 100K.  THE COURT: And that is in Exhibit 75?  THE WITNESS: Yes.  This number can be calculated and acquired by a calculating based on the number data in Exhibit 75.  Q. BY MR. FIGUEIREDO: So just so I understand and we all understand, on the third row, for example, of the first page, which is Cap Tan 10 U F/10 V.  You took the unit price of .018; is that correct? A. Correct.  Q. Multiplied it by 100,000; is that correct?  A. Correct.  Q. And multiplied that by 16 from the quantity needed for product column; is that correct?  A. Correct.  Q. And you did that for each distinct part on this exhibit; is that correct?  A. Yes.  Q. Well, let me ask you, Ms. Li.  There was some earlier testimony by someone else as to multiple source or second source components.  Do you understand what those terms mean?  A. I know.  Q. What is your understanding?  A. That means that in terms of one single part, that there is something that's considered main part and some other things that are considered substitute parts.  Q. Okay.  So I want to be clear.  When you did your calculation of the $2,357,354 number, did you add up main parts and substitute parts or only the main part?  A. I only calculate one into that number.  Q. So you excluded substitute parts for that calculation; is that correct?. . .  THE WITNESS: Yes").

[64]*Id.* at 66:12-67:1 ("Q. . . . Now, Ms. Li, earlier you testified as to a calculation you did of all the parts on Exhibit 75 based on receipt quantities limited to 100,000 maximum.  Do you remember that calculation?  A. Yes, I remember.  Q. And do you remember what that number was?  A. Yes.  It was U.S. dollars, 1,680,126.  Q. Now, did that calculation include main parts and substitute parts or just main parts?  A. That includes both.  Q. Have you recalculated that to exclude the substitute parts?  A. Yes.  Q. What is the number excluding the substitute parts?  A. It is U.S. dollars, 1,656,251").

[65]RT Day 1 (Huang) at 40:7-25.

[66]*Id.* at 41:14-42:6 ("Q. And after you sent this letter, which is Exhibit 105, did Unihan in fact discard the material[ ] that could not be resold, reused, or returned?  A. Correct.  In October of 2008, we decided that we could wait no longer.  So we started to move the common parts to be used in production of other products.  And when we got to May of 2009, . . . after this letter, which informed Max Group about these common parts situation.  And after that we hire a notary public organization to come to certify the existence of this kind of the parts.  Because at

19

1    it disposed of the materials.[67]

2    35.    From September 2008 to March 2009, Unihan incurred storage costs of $29,450 for the

3           components purchased to complete Max's mass production order.[68]

4

5                                   II.  CONCLUSIONS OF LAW

6           A.    Unihan's Claim for Breach of the Mass Production Contract (PO No. 142108)

7    36.    To prevail on a breach of contract claim, a party must prove the existence of a valid

8           contract, its performance of the contract or excuse for nonperformance, the other party's

9    _____

10   that time they have caused us a lot of losses in the storage of these parts in the warehouse.  So
11   after that certification, we discarded these parts"); RT Day 4 (Huang) at 30:16-31:25 ("Q. . . .
     Dr. Huang, can you take a look at Exhibit 78.  And, Dr. Huang, my question to you is do you
12   know whether or not the materials specified in Exhibit 78 were discarded, actually disposed of by
13   Unihan? . . .  A. Yes, I answered this question yesterday.  I signed this document.  They are
     indeed discarded.  Q. How do you know that they were in fact discarded? A. This is the operation
14   according to a company procedure.  Under our corporation, there are a lot of business units.  If
     the business unit is unable to handle the inventory, then the BU head, that's myself, will sign form
15   like this and send upward.  That means that the BU will assume the losses for these inventory, and
16   then they will submit the matter to the corporate level for the corporate level to handle.  Q. Okay.
     After you sign a form like this, if the company does not dispose of the materials, will they notify
17   you? A. Yes.  Q. And were you ever notified that the disposal did not happen? A. No.  Q. And,
18   Dr. Huang, what period of time typically after you  sign a form like this does the actual disposal
     happen? A. Normally, they will finish handling this matter within one season.  One quarter.  THE
19   COURT:  And what is the date that you signed the document?  THE WITNESS:  December 14,
     2009").
20

21        [67]RT Day 3 (Li) at 23:2-7 ("Q. Did Unihan receive any salvage value or any money when
     it disposed of . . . the Max Group materials? A. Yes. Q. Do you know what the amount was that
22   . . . Unihan received? A. 19,532 U.S. dollars.").

23        [68]Id. at 54:21-55:16 ("Q. Now, Ms. Li, in your position handling inventory control on the
24   Max Group project, did you know whether or not Unihan incurred storage costs for the stagnant
     materials? A. Yes. Q. What was the storage costs incurred by Unihan for the stagnant Max Group
25   materials? A. U.S. dollar, 29,450. Q. How was that calculated? A. 155 pallets times 10 U.S.
     dollars per month times 19 months. Q. Why 155 pallets? A. That's the actual pallet numbers that
26   were stored. Q. Why $10 per month? A. This is actual cost to Unihan. Q. Per pallet? A. Yes. Q.
27   Per pallet per month? A. Yes. Q. And why 19 months? A. From -- starting from September of
     2008 until March of 2010.  So there were 19 months in total. Q. What happened in March 2010
28   with respect to the stagnant inventory? A. It was discarded, actually discarded.")

breach, and resulting damage. See *Coprich v. Superior Court*, 80 Cal.App.4th 1081, 1092 (2000); *Harris v. Rudin, Richman & Appel*, 74 Cal.App.4th 299, 307 (1999); *Walsh v. West Valley Mission Community College District*, 66 Cal.App.4th 1532, 1545 (1998). See also *Kremen v. Cohen*, 99 F.Supp.2d 1168, 1171 (N.D. Cal. 2000). "Implicit in the element of damage is that the defendant's breach caused the plaintiff's damage." *Troyk v. Farmers Group, Inc.*, 171 Cal.App.4th 1305, 1352 (2009).

### 1.   Existence of a Valid Contract

37.   "To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages," i.e., the court must be able to determine if there has been a breach of the agreement and award damages. *Ladas v. California State Automobile Ass'n.*, 19 Cal.App.4th 761, 770 (1993) (citing *Robinson & Wilson, Inc. v. Stone*, 25 Cal.App.3d 396, 407 (1973)); *Richards v. Oliver*, 162 Cal.App.2d 548, 561 (1958); *Ellis v. Klaff*, 96 Cal.App.2d 471, 478 (1950)). "[T]he terms of a contract need not be stated in the minutest details," however. *Lawrence Block Co. v. Palston*, 123 Cal.App.2d 300, 308 (1954), disapproved on other grounds in *Mattei v. Hopper*, 51 Cal.2d 119 (1956). To establish the existence of an enforceable contract, a plaintiff need only show "a meeting of the minds upon the essential features of the agreement." *Lawrence Block Co.*, 123 Cal.App.2d at 308; see also *Krasley v. Superior Court*, 101 Cal.App.3d 425, 431 (1980) ("The essence of a contract is the meeting of minds on the essential features of the agreement"); *Justis v. Atchison, T. & S.F. Ry. Co.*, 12 Cal.App. 639, 641 (1910) (holding that plaintiff had sufficiently alleged the existence of a contract by producing the ticket defendant sold her, and noting that "[w]hile the ticket purchased by her, when considered alone, might be deemed merely a receipt, containing only a part of the contract made . . . it was evidence that there was a contract. It was evidence of the payment of her fare and of her right to be carried according to its terms, even though it did not express all the terms of the contract"). See also *Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 209 (2006) ("Under California law, a contract will be enforced if it is

21

sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached. To be enforceable, a promise must be definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages. Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable. The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. But if a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract" (citations and quotation marks omitted)).

38. "Whether mutual assent existed is determined by objective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe." *Harps v. County of Los Angeles*, 8 Fed. Appx. 771, 772 (9th Cir. Apr. 25, 2001) (Unpub. Disp.) (citing *Meyer v. Benko*, 55 Cal.App.3d 937, 942 (1976)); see also *Trew v. International Game Fish Ass'n, Inc.*, 404 F.Supp.2d 1173, 1177 (N.D. Cal. 2005) ("Whether parties have mutually assented to enter into a contractual relationship is determined with reference to an objective standard. The outward manifestations or expressions of consent to a contract are controlling; mutual assent is gathered from the reasonable meanings of the words and acts of the parties, not their unexpressed intentions or understandings" (citations omitted)).

39. The court concludes, based on the admissions of the parties and the evidence presented at trial, that PO No. 142108 constitutes a valid and enforceable contract for the purchase of 100,000 Lutro converter boxes. The key terms of the agreement are specified in the purchase order, i.e., price, quantity, product specifications, and delivery deadline.[69] While

---

[69]See Exh. 3.

there was contradictory testimony at trial as to whether the parties agreed to other terms, i.e., the credit or finance term, the purchase order as drafted is "sufficiently definite . . . for the court to ascertain the parties' obligations[.]" *Bustamante*, 141 Cal.App.4th at 209. See *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 763 (1984) ("Standard contends that the October 11th letter is not sufficiently precise, with respect to the essential terms of price, parties, and quantity, to pass muster. Put simply, this contention is not well taken. The October 11th letter evidences an agreement between the parties that Seaman's would become a 'Chevron,' i.e., Standard, dealer.   The price Seaman's agreed to pay for fuel was clearly set forth in the letter as 4.5 cents less than Standard's wholesale posted price at the time of delivery. Thus, both 'parties' and 'price' were established with sufficient specificity.  Moreover, although no express quantity term was set forth, none was necessary here"), overruled on other grounds by *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal.4th 85 (1995); *Stockwell v. Lindeman*, 229 Cal.App.2d 750, 755 (1964) ("The option covers a particular parcel, the balance of lot 8, to be sold at a purchase price of $31,000, payable $5,000 down, and $250 per month, including interest at 6 per cent, exercisable within six months.  The instructions state, 'balance of terms to be set out in said option.'  Thus, this provision of the contract makes certain the property to be sold, purchase price, down payment, monthly payments, interest rate, and the term, six months, within which the option is to be exercised.  Standing alone, this provision for an option constitutes an enforceable contract with the elements essential to a valid option being specified with definiteness and certainty"). Cf. *B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, No. C 07-02864 JSW, 2007 WL 3232276, *7 (N.D. Cal. Nov. 1, 2007) ("[E]ssential terms were not included in the promise, but rather, [ ] the [contract was] missing essential terms, such as price, contract duration, description of products, timing of purchases, and quantity of products. . . ."); *Western Emulsions, Inc. v. BASF Corp.*, No. CV 05-5246 CBM (SSx), 2006 WL 4599673, *1 (C.D. Cal. Apr. 28, 2006) ("[T]he Court finds that Western has failed to state a claim for relief because it fails to allege that the parties agreed upon such fundamental terms as the price and quantity of the

NX 1120 to be purchased by Western, as well as the time for performance or the contract's alleged duration").

40.   To the extent that Max asserts Unihan failed to accept the terms of PO No. 142108, that argument is foreclosed both by Max's admissions in this litigation,[70] and the parties' conduct after July 23, 2008.  California Commercial Code § 2207(3) establishes that "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract."  Here, Unihan, the party that allegedly did not accept the terms of PO No. 142108, engaged in conduct strongly suggesting that it believed a valid contract for mass production existed, such as acquiring component parts for 100,000 converter boxes and communicating with Max regarding a production schedule.  Max also acted as if a valid contract existed, by, *inter alia* sending Tang's August 27, 2008 and September 3, 2008 "stop work" emails, which expressly acknowledged that Unihan was engaged in manufacturing the units called for by the mass production order.

## 2.   Fraud in the Procurement

41.   Max asserts, however, that even if a valid mass production contract existed, it is void because it was procured by fraud.  "[F]raud in the inducement occurs when the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable.  In order to escape from its obligations the aggrieved party must rescind, by prompt notice and offer to restore the consideration received, if any."  *Hotels Nevada v. L.A. Pacific Center, Inc.*, 144 Cal.App.4th 754, 763 (2006) (citations and quotation marks omitted).  In California, fraud claims have five elements: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."  *Small v. Fritz Cos., Inc.*, 30

---

[70]See PCO at 4 ("Admitted Fact 2: Unihan accepted the terms of Purchase Order No. 142108.  See Max Group's Counterclaims, ¶ 15; Unihan's Answer to Max's Counter-claims, ¶ 15").

Cal.4th 167, 173 (2003); see also *City Solutions Inc. v. Clear Channel Commc'ns.., Inc.*, 365 F.3d 835, 839 (9th Cir. 2004).

42.  In support of its claim of fraud in the inducement, Max cites the conduct and representations Pai made during the parties' negotiation of the purchase order.  These included representations that "approval of the samples during each stage of production . . . was a condition precedent to Unihan's procurement of materials for and mass production of 100,000 converter boxes."[71]

43.  Unihan can only be liable for Pai's alleged misrepresentations if Pai was acting as Unihan's agent in his negotiations with Max.  See *Grigsby v. Hagler*, 25 Cal.App.2d 714, 715 (1938) ("It is well settled in this state that a principal is liable to third parties not only for the negligence of his agent in the transaction of the business of the agency but also for the frauds or other wrongful acts committed by such agent in and as a part of the transaction of such business").  The authority of the agent is "the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to [the agent]."  2B CALIFORNIA JURISPRUDENCE 3d Agency § 39 (2011).  An agent may possess one of a variety of types of authority, with "[t]he principal classification and distinction [being] that between actual and ostensible authority." *Id.*  "Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." CAL. CIV. CODE § 2316.  "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." CAL. CIV. CODE § 2317.

44.  Max does not contend, nor is there any evidence to suggest, that Pai had actual authority to negotiate on Unihan's behalf.  It is undisputed that Pai was not a Unihan employee at the time of the negotiations.  Indeed, Max has acknowledged that "[u]nbeknownst to [it], . . . Pai was not authorized to act, negotiate or make any representations on behalf of

---

[71]Max FFCL at 29.

Unihan to Max relating to any of the sample orders or the Mass Purchase Order."[72]

45.  Max asserts, however, that Pai had ostensible authority to act on Unihan's behalf.  It cites Pai's "represent[ations] to Max's representatives that although he was currently employed by Auvitek, he would immediately be joining Unihan, . . . that certain members of his sales team that he had already placed from Auvitek, including Oscar Cheng, were at Unihan[,] . . . that he and his team would be the leaders of Unihan's sales team for the Lutro converter box project," and that "he was authorized by and acting at the request and knowledge of Dr. Steven Huang, Unihan's then General Manager of Unihan's Business Unit No. 6, to negotiate with Max for Unihan as Unihan's agent the terms and conditions of sample and mass purchase orders for the Lutro converter box project."[73]

46.  As court's have repeatedly held, and the language of the statute makes clear,[74] ostensible authority turns not on the conduct of the agent, but on the conduct of the principal.  *New Line Productions, Inc. v. Little Caesar Enterprises, Inc.*, 9 Fed. Appx. 658, 661 (9th Cir. May 18, 2001) (Unpub. Disp.) ("Ostensible authority is not established by the statements and representations of the agent[,]" citing *Dill v. Berquist Constr. Co.*, 24 Cal.App.4th 1426, 1438 n. 11 (1994)); *Kaplan v. Coldwell Banker Residential Affiliates, Inc.*, 59 Cal.App.4th 741, 747 (1997) ("The ostensible authority of an agent cannot be based solely upon the agent's conduct. 'Liability of the principal for the acts of an ostensible agent rests on the doctrine of "estoppel," the essential elements of which are representations made by the principal, justifiable reliance by a third party, and a change of position from such reliance resulting in injury[,]'" quoting *Preis v. American Indemnity Co.*, 220 Cal.App.3d 752, 761 (1990)).

---

[72]Max FFCL at 12.

[73]Max FFCL at 7.

[74]See CAL. CIV. CODE § 2317 ("Ostensible authority is such as a *principal*, intentionally or by want of ordinary care, *causes or allows* a third person to believe the agent to possess" (emphasis added)).

47.   Max proffered no evidence of any conduct by Unihan that "cause[d] or allow[ed] [Max] to believe [Pai] . . . possess[ed]" the authority to negotiate on Unihan's behalf.  Max relies exclusively on the conduct by Pai, the purported agent.  "[O]stensible authority of an agent cannot be based solely upon the agent's conduct," however.[75]  Consequently, the court concludes that Max failed to prove that there was fraud in the procurement of the mass production purchase order contract.

### 3.   Performance or Excuse for Nonperformance

48.   "'A party complaining of the breach of a contract is not entitled to recover therefor unless he has fulfilled his obligations.'"  *Wiz Technology, Inc. v. Coopers & Lybrand*, 106 Cal.App.4th 1, 12 (2003) (quoting *Pry Corp. of America v. Leach*, 177 Cal.App.2d 632, 639 (1960)).  "It is elementary [that] a plaintiff suing for breach of contract must prove [it] has performed all conditions on [its] part or that [it] was excused from performance."  *Consolidated World Investments, Inc. v. Lido Preferred Ltd.*, 9 Cal.App.4th 373, 380 (1992) (citing *Reichert v. General Ins. Co. of America*, 68 Cal.2d 822, 830 (1968)).  It is undisputed that Unihan did not manufacture and deliver 100,000 Lutro converter boxes by September 30, 2008, or at any time thereafter.  Unihan contends, however, that it was excused from performing the contract due to Max's repudiation of it on August 27 and September 3, 2008.[76]

49.   An anticipatory breach occurs when a party expressly and unequivocally refuses to perform; an implied repudiation occurs "where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible."  *Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975) ("Anticipatory breach occurs when one of the parties

---

[75]While "[a] principal is liable 'when the principal knows the agent holds himself or herself out as clothed with certain authority and remains silent,'" there is no evidence suggesting that Unihan knew of Pai's representations.  *Norcal Mutual Ins. Co. v. Newton*, 84 Cal.App.4th 64, 78 (2001) (quoting *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88, 103 (1992)).

[76]RT Day 1 (Huang) at 32:17-33:19 ("Q. Unihan never completed production of the 100,000 boxes; is that correct?  A. In the end not a single unit was manufactured.  Q. Not a single unit against the 100,000; correct?  A. Correct").

to a bilateral contract repudiates the contract.  The repudiation may be express or implied. An express repudiation is a clear, positive, unequivocal refusal to perform . . . ; an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible"); *Martinez v. Scott Specialty Gases, Inc.*, 83 Cal.App.4th 1236, 1246 (2000) (quoting *Taylor*); *County of Solano v. Vallejo Redevelopment Agency*, 75 Cal.App.4th 1262, 1276 (1999) (same).

50.   When a promisor repudiates a contract, the promisee "may treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he . . . can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his . . . remedies for actual breach if a breach does in fact occur at such time."  *Romano v. Rockwell International, Inc.*, 14 Cal.4th 479, 489 (1996) (quoting *Taylor*, 15 Cal.3d at 137).   See also CAL. CIV. CODE § 1440 ("If a party to an obligation gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party").

51.   Max unequivocally expressed its intention not to perform on the contract on August 27, 2008, when Tang asked Unihan to "[p]lease wait for our further notice of the MP [because] there are still technical problems with the box, the pr[i]cing iss[u]e, and customer problem[s,]."[77]   It expressed the same intention on September 3, 2008, when Tang reiterated his instruction that Unihan not move forward with the mass production and stated: "The converter box program has short life as we all know, that is why I put a hold and stop on the production as you all should refer to the conditions that we listed on the

---

[77]PCO at 4 ("Admitted Fact 3: On August 27, 2008, Max's then employee, David Tang, sent an email to various representatives of Unihan stating: 'Please wait for our further notice of the MP [Mass Production], there are still technical problems with the box, the pr[i]cing iss[u]e, and customer problem[s].'"), Exh. 11.

1  PO."[78]  At that point, it was reasonable for Unihan to cease manufacturing activity on the

2  basis of Max's anticipatory breach.

3  52.  Max contends, however, that Unihan breached its obligations under PO No. 142108, such

4  that it cannot claim "[it] ha[d] performed all conditions on [its] part or that [it] was excused

5  from performance." *Consolidated World Investments*, 9 Cal.App.4th at 380.  Specifically,

6  Max asserts that: (1) "Unihan failed to furnish . . . 400 sample boxes that were defect free

7  by the[ ] August 15, 2008 due date under [PO Nos. 142034A and 142214]"; (2) "Unihan

8  failed to build . . . converter boxes [that were] 100% compliant . . . NTIA approved . .

9  . – it is undisputed that Unihan failed to furnish Max with a certificate evidencing NTIA

10  approval of the converter boxes by the September 30, 2008 delivery date"; (3) "Unihan

11  failed to furnish Max with all of the necessary EMI, FCC and UL certifications for the

12  boxes by the September 30, 2008 delivery date"; (4) "Unihan failed to furnish Max with

13  any licenses or license agreements with MPEG LA, MPEG 2, Dolby Lab, and Funai . .

14  . by the September 30, 2008 delivery date"; and (5) "[u]nbeknownst to Max, Unihan

15  started procuring materials for production of the 100,000 Mass Purchase Order before Max

16  approved of the samples."[79]

17  53.  As respects the second, third, and fourth types of alleged nonperformance, the law is clear.

18  Having repudiated the contract on August 28 and September 3, 2008, Max cannot assert

19  that Unihan breached the agreement by failing to perform obligations on September 30,

---

[78]PCO at 4 ("Admitted Fact 4; On September 3 or 4 (depending on whether measured by U.S. time or Taiwan time), 2008, Max's then employee, David Tang sent an email to various representatives of Unihan stating, among other things: 'The converter box program has short life as we all know, that is why I put a hold and stop on the production as you should all refer to the conditions that we listed on the PO'"); Exh. 12.

[79]Max FFCL at 31-32. Max also asserts that Unihan breached the contract by "fail[ing] to agree to the critical credit or finance term of 'net 30 days' term set forth in [PO No. 142108] and never approv[ing] . . . a line of credit for Max for the full contract price." (*Id*. at 32). The court has already found that the absence of a meeting of the minds on this term did not render the contract unenforceable. Because there was no meeting of the minds, there can be no claim of breach predicated on the failure to agree.

1   2008.  See CAL. CIV. CODE § 1440.

2   54.   Max's contention that "Unihan failed to furnish . . . 400 sample boxes that were defect free

3         by the[ ] August 15, 2008 due date under [PO Nos. 142034A and 142214,]" would be

4         persuasive if such conduct were a condition of PO No. 142108.  Unlike a contract term,

5         the breach of which must be material before it excuses the other party's performance, a

6         party's failure to satisfy a condition precedent excuses any remaining obligations of the

7         other party.  *AIG Centennial Ins. Co. v. Fraley-Landers*, 450 F.3d 761, 764 (8th Cir.

8         2006) (citing Richard A. Lord, WILLISTON ON CONTRACTS, § 38:7 (4th ed. 1990) and

9         RESTATEMENT (SECOND) OF CONTRACTS, § 224 (1981)).

10  55.   Conditions precedent are disfavored, and contractual promises will not generally be

11        construed as conditions to the other party's performance unless it is clear that this is what

12        the parties intended.  See, e.g., *Alpha Beta Food Markets v. Retail Clerks Union Local*

13        *770*, 45 Cal.2d 764, 771 (1956) ("[I]t is the general rule in contract interpretation that

14        stipulations in an agreement are not to be construed as conditions precedent unless such

15        construction is required by clear, unambiguous language. . ."); *Pacific Allied v. Century*

16        *Steel Products, Inc.*, 162 Cal.App.2d 70, 79-80 (1958) ("Conditions precedent are not

17        favored in the law and the provisions of a contract will not be construed as conditions

18        precedent in the absence of language plainly requiring such construction. . . .  Whether a

19        provision constitutes a condition or a covenant is determined from the whole document,

20        its purpose and the intention of the parties").  See also *Effects Associates, Inc. v. Cohen*,

21        908 F.2d 555, 559 n. 7 (9th Cir. 1990) ("Conditions precedent are disfavored and will not

22        be read into a contract unless required by plain, unambiguous language"); *West American*

23        *Ins. Co. v. Hernandez*, 669 F.Supp.2d 1211, 1223 (D. Or. 2009) ("'[A] court will not

24        imply that a covenant is a condition unless it clearly appears the parties so intended it,'"

25        quoting *Standard Oil Co. of Cal. v. Perkins*, 347 F.2d 379, 382 (9th Cir.1965)).  A

26        condition precedent is either an act of a party that must be performed or an uncertain event

27        that must happen before a contractual right accrues or a contractual duty arises.  *Platt*

28        *Pacific, Inc. v. Andelson*, 6 Cal.4th 307, 313 (1993).  See also CAL. CIV. CODE § 1436

("A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed").

56. PO No. 142108 contains no reference to and is not explicitly conditioned on the performance of PO No. 142034.  PO No. 142034, moreover, does not reference PO No. 142108, or a mass production purchase order.  Any oral representations that Unihan's procurement of components for, and mass production of, 100,000 units was conditioned on Max's approval of the 100 and 300 "sample orders" appear to have been made by Pai, whom the court has concluded was not an agent of Unihan.[80]  Based on the express terms of PO No. 142108, as well as the evidence presented at trial, the court cannot conclude that parties intended defect-free performance of PO No. 142034 to be a condition precedent to performance of PO No. 142108.

57. The same is true of Max's contention that Unihan failed to perform its obligations under PO No. 142108 because "[u]nbeknownst to Max, Unihan started procuring materials for production of the 100,000 Mass Purchase Order before Max approved of the samples." Again, given the "absence of language plainly requiring such construction," the court cannot conclude that Max's approval of the samples was a condition precedent to Unihan's

---

[80]See Day 2 (Tang) at 46:6-15 ("Q.  BY MR. TEITELBAUM:  Were the purchase orders linked together, and did you have any discussions with Mark Pai regarding the purchase orders being linked? A.  Yes.  It is linked together to reflect to the basic foundation of the – of the steps, the process.  Q.  Being golden samples, engineering run, pilot run, and mass production? A.  Yes, sir.  And to me golden sample means it is more perfect than a production unit.  It is made to impress your customers"); id. at 40:6-41:3 ("Q.  BY MR. TEITELBAUM:  Mr. Tang, what were you discussing with Mark Pai on July 21st regarding the schedule of samples and mass purchase?  A.  We were discussing the pricing issue, the terms and conditions, and also referring to the foundation that we laid way back in May 2008, the whole project steps and process.  Q.  And were the production schedules that [were] set forth in Exhibit 27 and Exhibit 4, were those discussed with Mark Pai in July of 2008?  A.  Yes.  Q.  And what was discussed, and what was said?  A.  It was discussed that we will follow the production model set by very first meeting in May, and all the steps that should follow.  And then we went into conditions, pricing, and quantity, forecast quantity, sample quantity, pilot run, and so forth.  Q.  So each stage, golden samples, engineering run, pilot run, and mass production.  And were those terms set forth – are those terms set forth in the purchase orders? . . . THE WITNESS:  Some of them were in the purchase order, yes").

1    procurement of component parts for the mass production order.

2    58.   Indeed, Unihan had only a short period between July 23, 2008, when Tang sent the mass

3          production purchase order, and September 30, 2008, the production deadline, to

4          manufacture 100,000 converter boxes.  As Huang testified at trial, Unihan needed to have

5          all the component parts purchased by the end of August 2008 to begin production and meet

6          the September 30, 2008 deadline.[81]   This testimony is supported by Cheng's

7          contemporaneous emails, in which he informed Max that he "need[ed] the user manual for

8          [the] Spanish version before 22/Aug.  Otherwise, [the mass production] will miss the

9          Spanish version [of the] user manual."[82]  It is also supported by Cheng's August 27, 2008

10         email, which proposed a delivery schedule for the mass production order and asked Tang

11         to send his "delivery schedule to us before 29/Aug."[83]  These communications indicate that

12         Unihan intended to begin manufacturing forthwith.  As it would have been impossible for

13         Unihan to begin manufacturing at the end of August, without having previously acquired

14         component parts, the court credits Huang's testimony that it was reasonable for Unihan to

15         begin immediately to acquire component parts upon receipt of the July 23, 2008 mass

16         production purchase order.  Moreover, had there been an implied condition that Unihan

17         should delay before procuring component parts, it would have been evident in the parties'

18         email communications, which were introduced at trial, as Unihan would likely have

19         expressed concern regarding the impending production deadline and the need to procure

20         component parts.   Indeed, even though Unihan began procuring component parts

21         immediately after Max sent PO No. 142108, Huang testified that it was "rushing the

22         supplier for materials" in order to begin production on schedule.[84]

---

[81]RT Day 1 (Huang) at 35:24-36:5.

[82]Exh. 6.

[83]Exh. 11.

[84]RT Day 1 (Huang) at 36:3-5.

32

### 3.    Max's Breach

59.    It is undisputed that Max "never paid Unihan any amount in relation to Purchase Order No. 142108."[85]

### 4.    Unihan's Damages

60.    "Actual damage as opposed to mere nominal damage is an[ ] essential element of a cause of action for breach of contract." *Roberts v. Los Angeles County Bar Assn.*, 105 Cal.App.4th 604, 617 (2004); see *Reichert v. General Ins. Co.* 68 Cal.2d 822, 830 (1968); see also *Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000) ("Under California law, a breach of contract claim requires a showing of appreciable and actual damage"). Under California law, "the measure of damages [for a breach of contract], except where otherwise expressly provided . . . , is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." CAL. CIV. CODE § 3300. It is therefore, "the loss or injury actually sustained rather than the price paid or agreed to be paid on full performance, [that] is the proper measure of damages[.]" *Avery v. Fredericksen & Westbrook*, 67 Cal.App.2d 334, 336 (1944). Damages are awarded in a breach of contract action to give the injured party "as nearly as possible the equivalent of the benefits of performance." *Lisec v. United Airlines, Inc.*, 10 Cal.App.4th 1500, 1504 (1992). See also *Lewis Jorge Const. Management, Inc. v. Pomona Unified School Dist.*, 34 Cal.4th 960, 967 (2004) ("Damages awarded to an injured party for breach of contract 'seek to approximate the agreed-upon performance.' The goal is to put the plaintiff 'in as good a position as he or she would have occupied' if the defendant had not breached the contract" (citations omitted)).

61.    "Contractual damages are of two types – general damages (sometimes called direct damages) and special damages (sometimes called consequential damages)." *Id.* at 968. "General damages are often characterized as those that flow directly and necessarily from

---

[85]PCO at 5 ("Admitted Fact 7").

33

a breach of contract, or that are a natural result of a breach.  Because general damages are a natural and necessary consequence of a contract breach, they are often said to be within the contemplation of the parties, meaning that because their occurrence is sufficiently predictable the parties at the time of contracting are 'deemed' to have contemplated them." *Id.* (citations omitted).  Special damages, by contrast, "are those losses that do not arise directly and inevitably from any similar breach of any similar agreement.  Instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties.  Special damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test)." *Id.* at 268-69.

62.   Unihan seeks damages of **$2,080,754**.[86]  It asserts that it has been damaged in this amount as a result of Max's failure to proceed with the mass production purchase order.  The figure is calculated as follows:

a.      Ordinarily, Unihan would have made a profit of **$492,646** on the contract with Max.  This is calculated by taking the contract price ($3,350,000)[87] and subtracting the manufacturing costs ($500,000),[88] as well as the total cost of the component

---

[86]Unihan Trial Brief at 16.

[87]Exh. 4.

[88]RT Day 1 (Huang) at 27:3-29:7 ("Q. And what was the expected manufacturing cost for manufacturing 100,000 of these converter boxes?  A. Based on the situation at Unihan in 2008, it would cost about 5 U.S. dollars per unit.  Q. Are you familiar with the difference between fixed costs and variable manufacturing costs?  A. I understand them very well. . . .  Q. And did the $5 per unit manufacturing cost on the Max Group project include both fixed and variable cost?  A. Yes. . . .  Q. And can you give us a breakdown as to the $5, what portion was fixed and what portion was variable?  A. It varies from product to product.  Not all products are the same.  But generally speaking, fixed cost usually is about 30 percent, and variable cost is usually 70 percent.  Q. And I'm asking specifically on this product for Max Group, the converter boxes.  A. In that case it has to be calculated in detail, but generally speaking, those two numbers can be applied to it.  Q. 30 percent and 70 percent?  A. Yes").

parts necessary ($2,357,354) to manufacture 100,000 converter boxes.[89]

b.      Unihan did not incur full manufacturing costs, however.  Instead of purchasing $2,357,354 worth of component parts, Unihan only purchased $1,656,251.[90]  Of these, it was able to use parts worth $228,061 on other projects, and only had to discard parts with a value of $1,428,190.[91]  When it discarded those parts, Unihan received $19,532 in salvage value.[92]  Therefore, Unihan suffered a **$1,408,658** loss on its purchase of component parts.

---

[89]RT Day 4 (Li) at 64:8-65:11 ("Q. Now, Ms. Li, assuming that for each distinct part on Exhibit 75, Unihan purchased exactly enough quantities to manufacture 100,000 boxes at the unit prices set forth in Exhibit 75.  Were you able to do such a calculation?  A. Yes.  Q. What was that calculation? . . . THE WITNESS:  Do you want me to give – directly give you the number?  Q. BY MR. FIGUEIREDO:  Yes.  A. The U.S. – the number is U.S. dollars, 2,357,354.  Q. Okay.  And can you explain exactly what you did to get that number?  A. I just used the materials that's in page 75 times unit price times quantity you needed for the production times 100K")

[90]Id. at 66:12-67:1 ("Q. . . . Now, Ms. Li, earlier you testified as to a calculation you did of all the parts on Exhibit 75 based on receipt quantities limited to 100,000 maximum.  Do you remember that calculation?  A. Yes, I remember.  Q. And do you remember what that number was?  A. Yes.  It was U.S. dollars, 1,680,126.  Q. Now, did that calculation include main parts and substitute parts or just main parts?  A. That includes both.  Q. Have you recalculated that to exclude the substitute parts?  A. Yes.  Q. What is the number excluding the substitute parts?  A. It is U.S. dollars, 1,656,251").

[91]RT Day 1 (Huang) at 41:14-42:6 ("Q. And after you sent this letter, which is Exhibit 105, did Unihan in fact discard the materials that could not be resold, reused, or returned?  A. Correct.  In October of 2008, we decided that we could wait no longer.  So we started to move the common parts to be used in production of other products.  And when we got to May of 2009, . . . after this letter, which informed Max Group about these common parts situation.  And after that we hire a notary public organization to come to certify the existence of this kind of the parts.  Because at that time they have caused us a lot of losses in the storage of these parts in the warehouse.  So after that certification, we discarded these parts"); RT Day 3 (Li) at 54:3-16 ("Q. And when you recalculated and came up with $1,428,190, you did not include the products listed on Unihan 038667; correct?  A. Are you talking about 038664 or 667?  Q. The calculation on 038664 included the numbers from 034667; correct?  A. Yes.  Q. But your calculation of $1,428,190 did not include the numbers from Unihan 038667; correct?  A. Correct").

[92]RT Day 3 (Li) at 23:2-7 ("Q. Did Unihan receive any salvage value or any money when it disposed of . . . the Max Group materials?  A. Yes.  Q. Do you know what the amount was that . . . Unihan received?  A. 19,532 U.S. dollars.").

c.     Unihan also incurred **$150,000** in fixed manufacturing costs,[93] and **$24,450** in storage costs[94] for the component parts purchased.

d.     Therefore, Unihan seeks a total of the expenses it actually incurred preparing for performance of the Max contract ($1,408,658 + $150,000 + $24,450) as well as the profits it would have earned had Max not breached ($492,646) = **$2,080,754**.

63.     "The reasonable expenditures incurred by the plaintiff in preparing to perform the contract may be included in the measure of damages."  23 CALIFORNIA JURISPRUDENCE 3d Damages § 53 (2011) (citing *Buxbom v. Smith*, 23 Cal. 2d 535 (1944); *Sobelman v. Maier*, 203 Cal. 1, 262 P. 1087 (1927); *Gollaher v. Midwood Const. Co.*, 194 Cal.App.2d 640 (1961); *Navarro v. Jeffries*, 181 Cal.App.2d 454 (1960); *Atlas Floor Covering v. Crescent House & Garden, Inc.*, 166 Cal.App.2d 211 (1958); *James v. Herbert*, 149 Cal.App.2d 741 (1957); and *Walpole v. Prefab Mfg. Co.*, 103 Cal.App.2d 472 (1951)).  See also *Advanced Thermal Sciences Corp. v. Applied Materials, Inc.*, No. SACV 07-1384 JVS (JWJx), 2010 WL 2015236, *52 (C.D. Cal. May 18, 2010) ("ATS is entitled to recover, as damages for AMI's breach, ATS's research and development expenditures and the value of the services ATS performed in reliance on the JDA.  See . . . *Blair v. Brownstone Oil*

---

[93]RT Day 1 (Huang) at 27:3-29:7 ("Q. And can you give us a breakdown as to the $5, what portion was fixed and what portion was variable?  A. It varies from product to product.  Not all products are the same.  But generally speaking, fixed cost usually is about 30 percent, and variable cost is usually 70 percent.  Q. And I'm asking specifically on this product for Max Group, the converter boxes. A. In that case it has to be calculated in detail, but generally speaking, those two numbers can be applied to it.  Q. 30 percent and 70 percent? A. Yes").

[94]RT Day 3 (Li) at 54:21-55:16 ("Q. Now, Ms. Li, in your position handling inventory control on the Max Group project, did you know whether or not Unihan incurred storage costs for the stagnant Max Group materials?  A. Yes.  Q. What was the storage costs incurred by Unihan for the stagnant Max Group materials? A. U.S. dollar, 29,450.  Q. How was that calculated?  A. 155 pallets times 10 U.S. dollars per month times 19 months.  Q. Why 155 pallets?  A. That's the actual pallet numbers that were stored.  Q. Why $10 per month?  A. This is actual cost to Unihan. Q. Per pallet?  A. Yes. Q. Per pallet per month?  A. Yes.  Q. And why 19 months?  A. From – starting from September of 2008 until March of 2010.  So there were 19 months in total.  Q. What happened in March 2010 with respect to the stagnant inventory?  A. It was discarded, actually discarded").

& *Refining Co.*, 35 Cal.App. 394, 396 [ ] (1917) ('But when he elects to go for damages for the breach of the contract, the first and most obvious damage to be shown is, the amount which he has been induced to expend on the faith of the contract, including a fair allowance for his own time and services.'). . . The rule applicable here is articulated in Section 349 of the Restatement of Contracts: '. . . [T]he injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.'  Restatement (Second) of Contracts § 349").

64.    While Max group contends that Unihan acted unreasonably in procuring component parts for the mass production order before Max had approved the 100 and 300 unit orders, the court has previously found that the mass production order was not expressly conditioned on obtaining such approval.  Moreover, given the tight production schedule, the court has found that Unihan acted reasonably by beginning to procure component parts as soon as the mass production purchase order was received.  Given this, the court concludes that the damages associated with the procurement of component parts was reasonably foreseeable to Max at the time of contracting, such that Unihan may recover for the losses it incurred.

65.    Unihan may also recover for $150,000 in fixed manufacturing costs incurred, as well as the $24,450 in storage costs it reasonably incurred as a result of Max's breach.  Again, these were "reasonable expenditures incurred by the plaintiff in preparing to perform the contract."  They were the foreseeable and "natural result of" Max's stop work order.  See *Silver Valley Propane, Inc. v. Lamanco, Inc.*, No. E045113, 2009 WL 180082, *1-5 (Cal. App. Jan. 27, 2009) (Unpub. Disp.) (rejecting an argument that fixed manufacturing costs should not be included in the amount awarded for breach of contract).[95]

---

[95]"Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority."  *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05-313 VRW, 2005 WL 2893865, *3 (N.D. Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330

66.   Finally, the court must consider whether Unihan is entitled to the profits it would have earned under the contract.   "Unearned profits can sometimes be used as the measure of general damages for breach of contract.   Damages measured by lost profits have been upheld . . . when the breaching party's conduct prevented the other side from undertaking performance." *Lewis*, 34 Cal.4th at 971.   See also *Coremetrics, Inc. v. Atomic Park.com, LLC*, No. C-04-0222 EMC, 2005 WL 3310093, *7 (N.D. Cal. Dec. 7, 2005) ("Coremetrics argues that it is entitled to recover the contract price because it expected to receive $101,000 from this transaction. . . .   The Court rejects this argument because it fails to recognize that by awarding Coremetrics the full contract price *without also deducting expenses saved* as a result of AtomicPark's breach, Coremetrics would be made more than whole. . . .   Had the contract been performed, Coremetrics would have incurred some costs; those costs need to be accounted for in determining lost profits.   Therefore, the most Coremetrics would be entitled to recover as damages here would be its lost profits, measured by the difference between the contract price and the expenses Coremetrics would have incurred had it performed" (emphasis added)).

67.   Unihan has deducted all expenses it saved as a result of not having to manufacture the 100,000 converter boxes ordered in PO No. 142108.   Since Max's conduct prevented Unihan from fully performing on the contract, and the amount of profits Unihan expected to earn is reasonably ascertainable by taking the contract price and deducting the expenses Unihan would have incurred but did not, the court concludes that Unihan is entitled to $492,646 in lost profits as well.

68.   Unihan is therefore entitled to total damages of **$2,080,754**.[96]

---

F.3d 1214, 1220  n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

[96]As Unihan has been awarded damages on its its breach of contract claim for the goods it purchased and the work it performed, the court need not address Unihan's common count claim, which alleges that "Max Group is indebted to Unihan for goods purchased by Unihan and work performed by Unihan."  (PCO at 9.)

**B.   Max's Counterclaims for Breach of PO Nos. 142108 and 142034A**

69.   Max asserted two counterclaims for breach of contract against Unihan: (1) "Max's First Counter-claim is for breach of the Purchase Order No. 142108 [ ] dated July 23, 2008"; (2) "Max's Second Counter-claim is for breach of Purchase Order No. 142034[A] dated July 29, 2008 (the 100 sample order)[.]"[97]

70.   Max's first counterclaim is based on the same evidence that it proffered to support its contention that Unihan failed to perform the mass production purchase order contract.  For the same reasons that the court found Max's defensive arguments unavailing, and concluded that Unihan was entitled to recover damages for Max's breach, the court finds that Max is not entitled to recover on its first counterclaim for breach of PO No. 142108. It will therefore enter judgment in favor of Unihan on Max's first counterclaim.

71.   Max also contends that Unihan breached PO No. 142034A.  The parties agree that PO No. 142034A was a valid, binding contract, which required that Unihan produce 100 Lutro converter boxes at a unit price of $35.00.[98]  It is undisputed that Max paid Unihan $3,500 by wire transfer for the 100 units that were delivered to it pursuant to PO No. 142034A.[99]

72.   Max contends that Unihan breached PO No. 142034A by: (1) "Delivering the 100 samples after the August 15, 2008 due date"; (2) "Failing to deliver 100 defect free samples – Max discovered that in excess of 10% of the samples were defective"; (3) "Failing to remedy each of the defects to the satisfaction of Max, despite due demand.  While Unihan sent an engineer from Auvitek to Max to try to remedy the problems, Auvitek's engineer could not solve the problems and Unihan failed to send any of its own engineers to do so"; (4) "[C]onceal[ing] from Max that there were additional software and hardware problems that Unihan's in-house engineers were discovering internally. . ."; (5) "[F]ail[ing] to build the sample converter boxes as 100% compliant . . . NTIA approved converter box . . . by

---

[97]*Id.* at 35.

[98]Exh. 2.

[99]PCO at 5 ("Admitted Fact 8").  See also Unihan FFCL, ¶¶ 92-95.

the August 15, 2008 delivery date"; (6) "[A]lter[ing] the parts and components of the converter boxes without the knowledge, consent or approval of Max"; (7) "[F]ail[ing] to furnish Max with all of the necessary EMI, FCC and UL certifications for the product by the August 15, 2008 delivery date for the sample order"; (8) "[F]ail[ing] to furnish Max with any licenses or license agreements with MPEG LA, MPEG 2, Dolby Lab, and Funai (these licenses and agreements were necessary to avoid any infringement claims by these companies) by the August 15, 2008 delivery date"; and (9) "[F]ail[ing] to return the sum of $3,500 that Max paid for these defective samples."[100]

73.  The terms of PO No. 142034A, which are apparent on the face of the contract, were as follows: (1) Unihan was to manufacture 100 "Maxmedia Lutro HD Digital ATSC Converter Box[es]" for a unit price of $35.00 and a total contract price of $3500.00; (2) the "order [had to] be shipped before 8/15" and Unihan had to "confirm [the] shipping method with Maxgroup before shipping"; (3) "The Lutro box [had to] be built to be 100% NTIA compliant as an NTIA approved converter box with [an] analog pass through feature"; (4) "Parts and components [could] not be altered without the consent of Maxmedia"; (5) "The Lutro converter box kit [had to] include all the necessary accessories with retail box, outer shipping case, pallet (when needed), remote controller, user manual, [and] RF cable"; (6) Unihan had to "provide all the necessary EMI, FCC and UL certification[s] applicable to this product"; and (7) Unihan had to "provide all the licenses needed for the ATSC converter box [including] MPEG LA, MPEG 2, Dolby Lab, V-Chip, Funai (if needed) [and] a list of all the license agreement[s.]"[101]

74.  Max has proffered undisputed evidence that Unihan did not obtain NTIA approval for the Lutro converter boxes until the end of September 2008; thus, the 100 boxes shipped in

---

[100]PCO at 39.

[101]Exh. 2.

August 2008 had not been NTIA approved.[102] Tang testified at trial that Unihan knew NTIA compliance was material to the parties' agreement because NTIA non-compliant boxes could be confiscated and Max intended to show the samples to potential customers, who would have been concerned about NTIA compliance.[103]

75.    Max has also proffered undisputed evidence that Unihan failed to provide 100 converter boxes with "all the necessary EMI, FCC and UL certification[s] applicable to this product" as well as "all the licenses needed for the ATSC converter box [including] MPEG LA, MPEG 2, Dolby Lab, V-Chip, Funai (if needed) [and] a list of all the license agreement[s]."[104]   Tang testified that such certifications were material to the contract

---

[102]RT Day 1 (Tang) at 124:12-15 ("A. The other major reason [that I put an end to production at the end of August 2008,] was Lutro was not NTIA listed at that time, and we always have the impression of Unihan was NTIA ready in end of May."); RT Day 2 (Tang) at 80:14-81:3 ("Q. And by this date, August 26th, had you received a certificate of NTIA compliance from Unihan? A. No, I had not. . .  Q.  And it was your understanding under Exhibit 2 and Exhibit 45 that you would have those certificates by August 15th; is that correct? A.  Correct. So to Max, none of the conditions were met. Not single one.").

[103]RT Day 2 (Tang) at 46:16-47:18 ("Q.  And weren't you telling Mark Pai, Oscar Cheng, Daniel Kuo at this time that you needed to have NTIA-compliant boxes produced to you and ready by this August 15th date under the initial sample orders? A. Yes. Q.  And why was it important? A.  It is important if we did not get all the certificates, the products could be confiscated by DHL, by air, or by Long Beach Port Authority.  Because we do not have the supporting documents for FCC, or Underwriter Laboratory labs, EMI, and so on and so forth.  Q.  But wasn't the samples – weren't you seeking the samples in order to provide them to your customers? A.  The customer definitely need to look at all those UL, FCC.  It is a must.  Q.  And did you have discussions with Memson and other retailers that you were having discussions prior to the issuance of these orders that they requested and required seeing samples?  A.  This is a mandatory and automatic must for any retailer to carry the products.  Radio Shack, Best Buy, Wal-Mart, Memson, Target, CVS Drugstore, they look at the product.  They look at all the certificates first.  FCC regulation.  That's a federal communications code, okay?  It's very important.  And the most important is NTIA, okay?  For a retailer – reseller, Best Buy, Wal-Mart, if you don't have the NTIA-approved stamp on it or if your product is not listed on the NTIA list website, they will not even look at the product as a sample").

[104]Id. ("Q. And by this date, August 26th, . . . had you received any of the certifications that are set forth in Exhibit 2, Exhibit 3 – Exhibits 2, 3, or 45?  A.  No, we have not.  Q.  So you hadn't received the EMI, FCC, UL certifications?  A.  No, none.  Q.  And you hadn't received

because "the products could be confiscated by DHL, by air, or by Long Beach Port
Authority [if they did not] have . . . supporting documents for FCC, or Underwriter
Laboratory labs, EMI, and so on and so forth," and because Max's potential customers,
"Radio Shack, Best Buy, Wal-Mart, Memson, Target, CVS Drugstore," to whom Max
was intending to show the 100 converter box samples, would "look at all the certificates
first."[105]

76. As it is undisputed that Unihan failed to ensure that the 100 Lutro converter boxes were
100% NTIA approved at the time of shipment, and that it failed to provide the necessary
certification and license information, the court concludes that Unihan breached at least
three material provisions of PO No. 142034A,[106] which entitles Max to damages for "the
loss or injury actually sustained[.]"   *Avery*, 67 Cal.App.2d at 336.

77. Max asserts that, as a result of Unihan's breach of PO No. 142034A, it "incurred damages
in the sum of $3,500, plus interest, that Unihan has never [returned], despite due
demand."[107]   Although "[t]he rule that the contract itself may furnish the measure of
damages is never allowed to override the paramount rule that compensatory damages will
be awarded only for actual loss incurred by the plaintiff," 23 CALIFORNIA JURISPRUDENCE
3d Damages § 55 (2011), the crux of Max's argument appears to be that without the

---

any of the licenses?  A.  No.  Q.  And it was your understanding under Exhibit 2 and Exhibit 45
that you would have those certificates by August 15th; is that correct?  A.  Correct.  So to Max,
none of the conditions were met.  Not [a] single one").

[105]*Id.* at 46:21-47:18.

[106]While Max contends that Unihan committed several other material breaches, Unihan has
proffered evidence suggesting that certain of these were non-material breaches (such as Max's
receipt of the 90 samples on August 20, 2008 rather than August 15, 2008) or non-breaches (such
as product design defects attributable to Powerray, the designer, rather than Unihan, the
manufacturer).  Because the court has found sufficient evidence of material breaches that entitle
Max to damages, it need not determine whether Unihan also breached the contract in the additional
ways identified by Max.

[107]PCO at 40.

42

necessary approval and certifications, the converter boxes were worthless for the purpose intended, and Max is therefore entitled to a refund of the entire purchase price.

78. As Unihan proffered no evidence of ways in which Max could have mitigated its damages, there is no basis upon which to reduce Max's damages.  See *Mass v. Board of Education*, 61 Cal.2d 612, 627 (1964) ("the burden of establishing mitigation rests with the defendant"); *Steelduct Co. v. Henger-Seltzer Co.*, 26 Cal.2d 634, 654 (1945) ("The burden of proof is on the party whose breach caused damage, to establish matters relied on to mitigate damage"); *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal.App.3d 442, 460 (1990) ("The burden of proving that losses could have been avoided by reasonable effort and expense must always be borne by the party who has broken the contract"); see also *Home Indemity Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1329 (9th Cir. 1995) ("This duty to mitigate damages rests on the party claiming damages, but the burden of proving failure to mitigate falls on the breaching party").

79. Max seeks interest on the $3,500 damages it suffered as a result of Unihan's breach. Although Max cited no case law in support of this request, it is possible that it is entitled to mandatory prejudgment interest under California Civil Code § 3287(a).  That statute provides, in relevant part, that "[e]very person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day. . . ."  CAL. CIV. CODE § 3287(a).  "[T]he court has no discretion [under section 3287(a)], but must award prejudgment interest upon request, from the first day there exists both a breach and a liquidated claim."  *North Oakland Medical Clinic v. Rogers*, 65 Cal.App.4th 824, 828 (1998); see also *American Federation of Labor v. Unemployment Ins. Appeals Bd.,* 13 Cal.4th 1017, 1045 (1996) ("As the Court of Appeal herein explained, 'no discretion is involved in an award of interest.  Once an [administrative law judge (ALJ) ] determines that retroactive compensation is due, the ALJ must award interest under Civil Code section 3287, subdivision (a)'" (alterations original)).  "Damages will be deemed 'capable of being made certain by calculation' if the amount due can be

43

determined by reference to a fixed standard: e.g., a payment schedule." *Marine Terminals Corp v. Paceco, Inc.*, 145 Cal.App.3d 991, 995 (1983); see also *Leff v. Gunter*, 33 Cal.3d 508, 519 (1983) ("'Damages are deemed certain or capable of being made certain . . . where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage,'" quoting *Esgro Central, Inc. v. General Ins. Co.*, 20 Cal.App.3d 1054, 1060 (1971)).

80.    Max proffered no evidence or argument regarding the "particular day" upon which its right to $3,500 in damages vested. While the court might posit that August 15, 2008, the deadline for performance under the contract, was the "particular day," it is also possible that the first material breach did not occur until sometime thereafter. Because prejudgment interest is a species of damages, Max as the moving party bears the burden of proving the amount of interest to which it is entitled.[108] Here, there is no justification for departing

[108]In *Lakin v. Watkins Associated Industries*, 6 Cal.4th 644 (1993), the California Supreme Court considered a plaintiff's request for prejudgment interest under Civil Code § 3291. A plaintiff injured in an automobile accident presented evidence at trial that she had suffered emotional distress and that her car had been damaged as a result of defendants' negligence. After the jury returned a $100,000 verdict, plaintiff sought prejudgment interest on the entire amount of the award. *Id.* at 657-58. The Supreme Court held that plaintiff had the burden of proving each fact essential to an award of prejudgment interest, namely, what portion of the verdict was attributable to emotional distress, and thus would support an interest award, and what portion was attributable to property damage, and would not support such an award. *Id.* at 660 ("It is plaintiff who is claiming prejudgment interest; thus, under the general rule it is plaintiff who bears the burden of proving each fact essential to an award of such interest, including the amount or proportion of personal injury damages in the judgment"). The Court noted, in this regard, that "[t]he general rule allocating the burden of proof applies 'except as otherwise provided by law.'" In determining whether to make an exception in a particular case, it stated, a court should consider "the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact." *Id.* at 660-61(citing CAL. EVID. CODE § 500, Cal. Law Revision Comm. Comments). Applying these factors, the Court found no reason to depart from the general rule in the case before it. It stated: "Personal injury defendants possess no special knowledge of the basis of a jury's award of damages; the plaintiffs in such cases can request special verdicts or devise other means of identifying damages awarded for personal injury. Nor are we aware of any public policy that would justify creating a

44

from the general rule that Max bears the burden of proving all of the facts necessary to an award of prejudgment interest.  Because Max has failed to meet its burden of showing "damages certain, or capable of being made certain by calculation, and the right to recover which is vested in [it] upon a particular day," the court cannot award prejudgment interest as requested.

### III.   CONCLUSION

For the reasons stated, the court finds for Unihan on its breach of contract claim, and awards it damages of $2,080,754.  The court enters judgment in favor of Unihan on Max's first counterclaim, but finds in favor of Max on its second counterclaim and awards it damages of $3,500.  The court will enter judgment accordingly, offsetting the amount of Max's recovery on its counterclaim against Unihan's recovery on its breach of contract claim.

DATED: December 28, 2011

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

presumption that all damages in personal injury cases are eligible for prejudgment interest and then requiring defendants to rebut that presumption."  *Id.* at 661.